## Case No. 18,194.

### The YUCATAN.

[4 Adm. Rec. 31.]

District Court, S. D. Florida.    May 26, 1847.

SALVAGE — AUTHORITY AND DUTY OF MASTER OF WRECK—INTRUDING SALVORS—AMOUNT OF COMPENSATION.

[1. The master of a ship wrecked upon the coast continues to be the master, with all a master's rights, authority, and responsibility, as long as anything remains of ship or cargo to be saved by him. And he cannot divest himself of that character, or so delegate his authority to a salvor as that he may not at any time resume it. He has the custody and charge of the property, and may make such arrangements as he sees fit for saving it, and no stranger can interfere without his consent.]

[2. One who weighs up and carries off, against the express commands of the master, cargo accidentally fallen overboard in the salvage operations, and which the authorized salvors intend to save at their earliest convenience, can recover no salvage therein. Nor can he have salvage in cargo which he takes from the wreck during the temporary absence of the master and authorized salvors.]

[3. Forty-three per cent. allowed, upon a gross valuation of $41,924.25, for saving cargo, mainly by diving, from a vessel totally wrecked on Florida Reef; 9 vessels and 95 men being employed for about 17 days. Also 60 per cent. allowed to small boats upon remnants of cargo saved by diving after the wreck was abandoned by the principal salvors.]

[4. A vessel, employed for a stipulated sum, by the principal salvors, with the acquiescence of the master of the wrecked ship, cannot, under any circumstances, recover salvage in addition to the sum agreed.]

Adam Gordon, for libelants.

Wm. R. Hockley, for respondent.

MARVIN, District Judge. This suit is instituted by the libelant [John P.] Smith and about 150 others, some of whom are joined with him in the main libel, and the rest appear as petitioners under the libel. They all claim salvage for services rendered to the cargo and materials of the ship Yucatan (Casey, master), wrecked upon Carrysfort Reef. Upon the trial of the cause considerable testimony was taken upon the subject of the comparative merits and demerits of the different sets of salvors in saving the cargo and materials, and also in relation to their respective shares in the salvage to be decreed. I shall not attempt to state or comment upon the mass of the testimony given upon the different branches of the case, or to reconcile any of its inconsistencies; nor shall I often give the reasons why certain portions of testimony should be believed and other portions rejected. I shall only state the main facts in the case as I believe them to be established by the testimony, and then apply the law to these facts.

The principal facts in the main cause, as alleged in the libel, admitted in the answer and proved by the testimony, are these: The ship Yucatan (Casey, master), laden with a cargo of cotton, pork, flour, and meal, while on a voyage from New Orleans to Liverpool, on the night of the 20th of April last, in tempestuous weather, struck upon that part of the Florida Reef known as Carrysfort Reef, and before morning filled with water. In the morning Captain Smith, of the sloop Gazelle, a regular wrecker on the coast, arrived at the wreck, and soon after the British schooner Triton, a transient vessel bound to this port, and the regular wrecking sloop Globe. In the afternoon of the same day the wrecking sloops George Eldridge and Convoy arrived. When Smith boarded the ship, she was filled with water, and was straining and working badly, so as to endanger her breaking in pieces. To relieve the wreck he advised Captain Casey to cut away the masts, which was accordingly done. The crews of the Gazelle, Globe, and Triton then attempted to save some portion of the cargo by boating it on board the Triton; but after transferring to the Triton eight bales of cotton, sailors' chests, and a few other articles, the weather became so tempestuous as to render it prudent for all persons to abandon the wreck and seek a harbor on board the wrecking vessels. This was accordingly done. The gale continued during the night of the 21st and a considerable portion of the 22d. On the 22d the salvors returned to the wreck, and succeeded in saving a small quantity of corn and a few bales of cotton. They were, however, soon obliged, by the continued bad weather, to seek shelter and safety in the harbor at Key Roderiguez. On the morning of the 23d, they again returned to the wreck, and partly loaded the schooner Triton. At this time, the wrecking sloops Plume, America, Vineyard, and Empire having arrived at the wreck, were consorted with the Gazelle, Globe, George Eldridge, and Convoy, making a force of eight vessels, of an aggregate tonnage of 445 tons and 79 men. These men now went to work to discharge the cargo and put it on board their vessels. During the 23d but little was accomplished, as the sea continued so rough throughout the day that no vessel could lie alongside of the wreck. On the 24th the wind had abated, and the sea had become smooth. The weather now remained good, and the sea smooth, throughout the whole period of the labors of the salvors, except a slight squall one afternoon. They continued their labors in discharging the ship, and placing the cargo on board their vessels, and bringing it to this port, until the 9th of May, when the principal salvors abandoned the wreck to another set of salvors, who saved the residue of the cargo. On the 26th of April the sloop Texas and her crew were united with the other salvors, thus increasing the force by another vessel and 16 men. The labor of breaking out the cargo and of transferring it on board the wrecking vessels was very considerable. The wreck heeled over very much, bringing the deck of the lower side several feet under water. The hold on the lower side was entirely full of water, and nearly so in the cen-

ter. It was a work of great labor and difficulty to break out the cargo. It had been stowed very compactly. The corn in bags swelled, thus pressing the cargo more firmly together. To facilitate the discharge, the beams of the ship were cut asunder, to allow the vessel to open and spread, and thus loosen the cargo. The decks were cut away, and finally, on the 28th of April, the salvors set fire to the wreck, and burned off the deck and sides, down to the water's edge, to enable them to get at the cargo. For several days previous to burning the deck, the noxious gases and impure exhalations arising from the wet corn, in a state of fermentation and decomposition, sickened and blinded the men employed in the hold. Nearly or quite one-half of the cargo was saved by diving. In short, the entire service seems to have been one of some labor and fatigue, particularly to the divers, but unattended by any danger, except to the health of the divers exposed to the impure air in the hold. The general management and direction of the business of saving the cargo was committed to Captain Smith, as the first boarder and principal wrecker, by Captain Casey, who, however, remained by the wreck, advising, assisting, and controlling, as he thought proper. The mate, too, remained at the wreck, and kept an account of the cargo put on board the several wrecking vessels.

These are the principal facts connected with the saving of this cargo. On the trial of the main cause I was disposed to think that more time had been consumed in saving the property than was necessary, and that the active and prompt energies of the salvors had not been so much exerted, as are usual in like cases on this, in consequence of dissatisfactions existing among the salvors themselves as to the terms of their agreement to divide the salvage to be earned, and in consequence of delays arising in making these agreements. In a collateral proceeding, too, it is alleged by Stickney that Smith did not labor in good faith; that he repeatedly refused to permit other men and vessels than those already employed to save cargo; and it is suggested that, if he had allowed all persons arriving at different times at the wreck to save what they could, that the cargo would have been saved in much less time and in better condition. A fuller consideration of the whole case, a comparison of dates, and careful reflection upon the testimony have satisfied my mind that these charges and imputations upon Smith are entirely without foundation in truth. I think that he had at all times vessels and men enough employed to save the cargo, in nearly or quite as short a time as was practicable, and stood ready at any time or moment to employ more, if Captain Casey thought it necessary. Smith was the active man under Casey, and employed for him all the men and vessels Casey desired. The only part of Smith's conduct which appears to me is at all liable to censure is his hesitation and omission to employ and set to work all the divers he could procure, without waiting to bargain or agree with them as to the amount of their compensation. But even on this point it is difficult to determine from the testimony whether these divers would have gone to work without making terms on their part, or whether they were very much needed before they were actually employed, or whether his associates would have been satisfied if they had been employed without an understanding as to the amount of their compensation.

But, before proceeding to consider and decide the question of the amount of salvage to be allowed in this case, it will be well to examine and dispose of the petition of Captain Stickney. By so doing we shall have a more complete and full view of the whole case. It appears from his petition and the testimony that he arrived at the wreck on the 26th of April, in the Governor Bennet, with a crew of 12 men, and found Captain Smith in charge of the business of discharging the cargo. He applied to Smith for leave to go to work, and was refused. He alleges that the master of the ship had resigned the authority and control to Smith. This allegation is not proved, but, on the contrary, is disproved. He alleges that Smith did not labor in good faith; that he loaded but one vessel at a time, when several might have been loaded; that the cargo might have been saved in half the time; that Smith's forces did not work nights, when they might have done so; that Smith would not permit his (Stickney's) crew to work at night; and that much cargo, of great value, was totally lost by the refusal of Smith to permit him to labor, either by day or night. He alleges that the wreck was totally deserted on the 5th of May, and that he proceeded to take from it 26 bales of cotton, 8 barrels of pork, 7 barrels of lard, 7 barrels of corn meal, and a lot of rigging, all of which he has saved and brought to this port. He also dived up a bale of cotton that had fallen overboard and sunk, although forbidden to do so, which he also brought to this port, and he prays salvage upon these articles.

In regard to several of these allegations and charges against Smith, it may be remarked that they are matters of opinion merely, and are not capable of any direct proof or disproof. In regard to several others, they are disproved. It may be true that Captain Casey had resigned the authority or control in the business of saving the cargo to Captain Smith. Smith acted and labored under Captain Casey. Captain Casey permitted Smith to exercise a general management and control, to employ vessels and men when necessary, to refuse to employ others when unnecessary, and, generally, to act for him, so long as his acts and conduct were satisfactory to Captain Casey. It is true that Smith refused to allow Stickney's crew to go to work, but at that time there were sufficient vessels and men employed to save the cargo. Smith's forces did work,

in the early part of the transaction, several nights, and, at a later period, part of the nights. Whether any men could have worked safely or to any advantage in the night, at any time after Stickney arrived at the wreck, I think very doubtful. After that time all the cargo had to be broken out by diving under the water, and whether this is a safe or prudent operation to be performed in the hold of a vessel in the night is, I think, very doubtful. I do not think that any cargo was lost by Smith's refusal to permit Stickney's crew to work. Much testimony has been taken upon these allegations of Stickney, and a great deal of it has been vague and unsatisfactory, and much of it mere matters of opinion. To recapitulate or comment upon this testimony would be tedious and unprofitable. It is sufficient to say that the impression made upon my mind by all of the testimony on both sides is by no means unfavorable to the capacity, energy, good faith, and good conduct of Captain Smith, as displayed in saving this cargo; nor is the testimony unfavorable in any degree to the competency, efficiency, and good conduct of Captain Casey and Mr. Hezelwood, his mate.

Captain Stickney, in his petition, prays salvage on the bale of cotton dived up and saved by him. and on the cotton, pork, lard, and meal taken by him from the wreck; and the question to be decided is, is he entitled to it? As to the bale of cotton saved by diving, it appears that it had fallen overboard accidentally, and some one of the salvors told Captain Stickney that he might have the salvage on it if he would weigh and save it. He accordingly did so, but before and at the time of weighing the bale Captain Casey positively forbade his taking it, and again, before he had carried it on board his vessel, Captain Casey forbade his doing it. He still persisted in claiming that he had a right to save it, and expressed his willingness to abide by the decision of the court on the point. The reason Captain Casey assigned for prohibiting Stickney's saving the bale is that he did not wish to have the bale separated from the rest of the cargo. As to the 26 bales, the pork, lard, etc., taken by Stickney from the wreck, he alleges that, at the time he commenced taking them, the wreck had been totally deserted, and insists, therefore, that he had a right to take them. But before he had got out more than a very few bales, the other salvors returned to the wreck, when they, with the mate of the ship, who had now been left in charge, forbade his proceeding any further in obtaining cargo. It is evident, from the character of these transactions, that Stickney believed that the sunken bale of cotton had been abandoned at the time he weighed it, and that therefore he had a right to do so, and also that he believed that the wreck had been abandoned. There is no doubt that, if the sunken bale or the wreck had been at any time aban-

doned or deserted, in the proper sense of these words, by Captain Casey and the first set of salvors, then Stickney, or any other first comer or finder, would have the right to take possession of the bale and the wreck, and save what they could. But the facts are not so. As to the sunken bale, it had accidentally fallen overboard, the salvors intending at their earliest opportunity to weigh and save it. They had not abandoned it. They were there with all the means necessary, and they intended to save it. Captain Casey had not abandoned it, and he forbade Stickney's interfering with it. Neither had the salvors nor Captain Casey abandoned or deserted the wreck at the time that he took from it the 26 bales of cotton, the pork, and meal. They were but temporarily absent, intending to return. They had given up no right to save the property. They did almost immediately return, and continue to work at the wreck for several days afterwards.

Now, there is nothing clearer than that the master of a ship wrecked upon the coast remains and continues the master, with all a master's rights, authority, and responsibility, as long as a plank of her remains or a particle of the cargo can be saved by him. He cannot divest himself of the character of master, or so delegate his authority but that he may at any time resume it; for it is an authority conferred upon him by law. He has the custody and charge of the property with a special and qualified interest in it, and he may make such arrangements as he sees fit for saving it. No stranger has ordinarily any right to interfere, without his consent, under the pretense of saving the property. It is possible for extreme cases to exist where even a stranger might have the right to interfere to save and protect the property from destruction for the benefit of the owner; as when the captain of a vessel should fraudulently undertake to destroy the vessel and cargo by setting fire to them, or should attempt to run away with them, fraudulently intending to convert them to his own use, or to engage the vessel in acts of piracy. But these are extreme cases, and not at all like the one before us. In the present case Captain Casey was employed with a sufficient force in saving this property, and Stickney had no right to interfere with it without his leave and license. But suppose Captain Casey had resigned, or delegated to Captain Smith the management and control of the business of saving the cargo of the Yucatan; or suppose that the wreck had been abandoned by her captain and crew, and found as derelict by Smith, or by him and his associates, Stickney would not, in such case, have any right to interfere with Smith's possession of the property, or his conduct in saving it without his consent, unless in some such extreme cases as I have noticed above. as applicable to the master. Nothing is clearer than that a salvor or set of salvors in possession has a lien,—a quali-

fied property in the thing; and no other persons, without his or their consent, can lawfully intrude themselves upon that possession, or gain a title to be deemed co-salvors. The Maria, Edw. Adm. 175; The Henry Ewbank [Case No. 6,376]; Hand v. The Elvira [Id. 6,015]. Even the master of a ship himself would not have a right to dispossess a salvor without his consent who had earned a clear right to salvage by rendering actual meritorious service. In short, in every point of view in which I am able to consider the matter, it appears to me that Stickney's interference, under the circumstances, was wrongful, and that his petition should consequently be dismissed.

To return, now, to the question of the amount of salvage to be decreed. Upon this subject little need be said. The main facts of the case have already been stated. The number of salvors is unusually large, and the services of all of them were needed in order to save the cargo as soon as possible from its perishing and perilous condition. Whatever amount shall be decreed the share of each upon a division and distribution will, in consequence of their great number, be small. The salvors were employed in this service in all about 17 days. The amount of property saved by them is $41,924.85. A large portion of this amount was saved by diving. All the circumstances considered, I think that 43 per cent. upon the amount saved by the larger wrecking vessels is a reasonable compensation. It will give to each no great reward, but it is as much as, under all the circumstances, I think I ought to allow. It is not common to allow, in any cases in this court, more than the one moiety of the net value of the property saved. In this case, by charging the residue with the payment of the costs and expenses, the wharfage and storage, etc., it will be found that the rate of salvage received will be equal nearly to the one-half of the net amount of the proceeds of sales. Upon the amount saved by the Robert Henry and the small boats a larger rate of salvage ought to be allowed. These vessels saved small amounts by diving after the wreck had been abandoned by the other salvors. As to them 60 per cent. of the amount saved ought to be allowed. Salvage, eo nomine, cannot be allowed for the services rendered by the schooner Triton, not because she was a foreign or a transient vessel, but because her services were hired by Captain Casey, or by Smith acting for him, for the sum of $300. I know of no principle which can entitle her to any more than the sum agreed upon. If Captain Casey permitted or directed Smith, as being the principal wrecker, and having the chief management under him of the business of saving the cargo, to hire the services of this vessel, all the advantages arising from such hiring must and do inure to the owners of the cargo; and if Casey, or Smith, in charge under him, could have hired all the vessels employed at the same rate, it would

have been his duty to do so, and thereby save the expense of salvage to the cargo. The sum, however, agreed upon for the hire, should be paid, and also the further sum of $200 should be paid to Smith and his associates as a compensation for loading the Triton. The property saved by Stickney and his crew is not to be included in the amount liable for salvage, for the reasons I have given. The petition of Casey and others remains to be considered; but as the subject-matter of this petition relates almost entirely to the distribution of the salvage and the conflicting claims of the different sets of salvors as among themselves, in which the owners of the cargo can have no interest, I forbear for the present expressing any opinion upon it.